OFFICE COPY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------x

**CLARIDGE PRODUCTS and**
**EQUIPMENT, INCORPORATED**
individually and on behalf of all others
similarly situated,

                **Plaintiff,**

    -against-

**GOLDMAN SACHS GROUP, INC.,**
**GS POWER HOLDINGS LLC,**
**METRO INTERNATIONAL**
**TRADE SERVICES LLC,**
**LONDON METAL EXCHANGE**
**LIMITED; LME HOLDINGS**
**LIMITED; and JOHN DOES 1-10**

            **Defendants.**

----------------------------------------x

Civil Action No. **13 CV 7642**

Related Case: 1:13-cv-05537-VM

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



## CLASS ACTION COMPLAINT

Plaintiff complains, upon knowledge as to itself and its own acts, and upon information and belief as to all others:

### I.     INTRODUCTION

1.     This is an antitrust case concerning aluminum. Plaintiff's claims arise from Defendants' combination, conspiracy or agreement with one another and other persons to restrain aluminum supplies in Goldman's London Metal Exchange (LME) Detroit warehouses to inflate aluminum prices, including the Midwest Premium.

2.     Plaintiff's Complaint alleges claims on behalf of a Class of direct purchasers of aluminum, as defined herein. Plaintiff seeks redress for Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2, under Section 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 16, entitling Plaintiff and the Class to money damages, treble damages, injunctive and other relief.

### II.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, and 15 U.S.C. §§ 7, 15(a), and 26.

5.     The Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold aluminum throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States including this District.

6.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391.

During the Class Period members of the Class resided in this District, one or more Defendants, transacted business, were found, or had agents in the District and a portion of the events establishing the claims arose or occurred in this District.

7.      The activities of the Defendants and their co-conspirators, were within the flow of, intended to, and in fact had a substantial effect on interstate commerce and foreign commerce of the United States. Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably foreseeable effect on domestic commerce, proximately causing anticompetitive effects within the United States.

### III.      DEFINITIONS

8.      As used, the terms "Midwest Premium" or "Platts MW Premium" means and includes the Midwest Premium or Platts MW Midwest Premium or Midwest Transaction Price or the Platts Metals Weekly Premium or similar terms.   The premium is a standard contract benchmark price term for purchasing and selling physical aluminum in Michigan, Ohio, Wisconsin, Indiana, Illinois, Minnesota, contiguous and other areas of the United States.

9.      As used, the phrase "Class Period" means the time extending from February 1, 2010 to present.

### IV.      PARTIES

10.      Plaintiff CLARIDGE PRODUCTS AND EQUIPMENT, INCORPORATED ("Plaintiff") in an Illinois Corporation, with a principal place of business in Harrison, Arkansas. Plaintiff was damaged in its business or property by purchasing aluminum pursuant to a contract term based on the Midwest Premium, which Defendants, by their illegal conspiracy and overt acts in furtherance thereof, intentionally and directly artificially inflated throughout the Class Period.

11. Defendant GOLDMAN SACHS GROUP, INC. ("Goldman Sachs") is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified client base. Goldman Sachs is located at 200 West Street, New York, New York 10282.

12. Defendant GS POWER HOLDINGS LLC ("GS Power Holdings") is a significant subsidiary of Goldman Sachs Group, Inc. GS Power Holdings is located at 85 Broad Street, New York, New York 10004.

13. Defendant METRO INTERNATIONAL TRADE SERVICES LLC ("Metro International") is a global warehouse operator, specializing in the storage of non-ferrous metals, including aluminum, for the LME. Metro International is an LME-approved warehouse. Goldman Sachs acquired Metro International in February 2010 and Metro International operates as a subsidiary of GS Power Holdings LLC. As of March 8, 2013, Metro International operated 29 out of 37 LME-listed storage facilities in Detroit, Michigan. The headquarters of Metro International are at 6850 Middlebelt Road, Romulus, Michigan 48174.

14. Goldman Sachs, GS Power Holdings, and Metro International are sometimes referred to herein as the "Goldman Defendants."

15. Defendant the LONDON METAL EXCHANGE LIMITED ("LME") is the world center for the trading of industrial metals. LME's trading platforms have Eighty Percent (80%) of all non-ferrous metal futures business. The LME connects participants from the physical industry and the financial community to create a market for buyers and sellers, and provides producers and consumers of metal with a physical market of last resort and the ability to hedge against the risk of rising and falling world metals prices. The LME also has a large network of storage units for its commodities, including aluminum. The LME is located

at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and this District, including through meetings held in the United States to encourage use of LME contracts, and storage operations through its approved warehouses that hold most United States' aluminum.

16.     Defendant LME HOLDINGS LIMITED is a corporation that, until December 6, 2012, owned the LME. Defendant Goldman Sachs and other leading American banks including JPMorgan, Citigroup, Merrill Lynch and Morgan Stanley owned the largest portion of LME Holdings Limited. On December 6, 2012, the LME was acquired by Hong Kong Exchanges & Clearing, Ltd. ("HKEx").

17.     John Doe Defendants 1-10 are other persons who own warehouses, have similar financial interests as the Goldman Defendants, and have otherwise entered into the illegal conspiracy alleged herein.

18.     The LME Defendants, the Goldman Defendants, and the John Doe Defendants are sometimes referred to herein as the "Defendants."

19.     The acts charged have been done by some or all of Defendants and their co-conspirators within the scope of the alleged conspiracy alleged herein. Alternatively, the acts charged were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaging in the management of each Defendant's business or affairs.

## V.     CLASS ALLEGATIONS

20.     Plaintiff brings this case as a class action under Rule 23 of the Federal Rules of Civil Procedure for itself and a Class (the "Class") composed of and defined as:

> All persons and entities residing in the United States who, from February 1, 2010 to the present directly forward purchased aluminum pursuant to a contract with a price term based, in any part, on the Midwest Premium or Platts MW Premium or similar terminology,

including but not limited to an averaging over a period of days of any such premium.

Excluded from the Class are Defendants, any parent, subsidiary, affiliate, agent or employee of any Defendant, and any co-conspirator.

21.     Plaintiff reserves the right to amend or modify the Class definition in a motion for class certification and/or as the result of meaningful discovery.

22.     This action has been brought and may be properly maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

    a.    The Class is so numerous that joinder of all members is impracticable;

    b.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's claims arise from the same common conduct establishing the claims of the members of the Class and the relief sought is common to the Class;

    c.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact are:

    (1)    Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;

    (2)    Whether Defendants made agreements in unreasonable restraint of trade;

    (3)    Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum, including the Midwest Premium, or Platts MW Premium portion;

    (4)    Whether such violations inflated such prices of aluminum;

    (5)    Whether such inflation caused antitrust injury to the business or property of Plaintiff and members of the proposed Class;

    (6)    Whether an award of damages, including treble damages, is warranted; and

(7)   Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

d.   Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class;

e.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all members of the Class is impractical; the damages or injuries suffered by individual Class members are relatively small absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them; and

f.   Defendants have acted, and refused to act, on grounds applicable to the Class, making appropriate final injunctive relief regarding the Class as a whole.

## VI.   RELEVANT MARKET

24.   Plaintiff disclaims any need to plead a relevant market on its Section 1 claim because the restraint of trade here directly inflated price, restricted supply, anti-competitively restrained free alienability of aluminum, and otherwise constitutes a per se violation of Section 1 of the Sherman Antitrust Act.

25.   Alternatively the Relevant Markets are one or more following:

a.   The market for providing exchange-traded aluminum forward or futures contracts, including to approved warehouses for exchange-traded aluminum in the United States. The LME has had 97-99% of the aluminum futures contract trading and has had the power to approve the warehouses holding 95-100% of the aluminum for such trading.

b.   The market for warehouse storage of aluminum in the United States in LME Warehouses or the market for warehouse storage of that portion of both LME warehouse aluminum and non-LME warehouse aluminum in areas in which purchase and sale contracts for aluminum are based on the Midwest Premium or the Platts MW Premium price. The growing aluminum in the LME

Warehouses in the United States is estimated to constitute approximately 50% or more of the fluctuating total amounts of aluminum stored by warehouses in the United States. That percentage is even higher for aluminum stored in places that transact at Midwest Premium or Platts MW Premium prices.

c. The LME has the power to control or agree to the terms and operations of its warehouses that hold all the LME aluminum in the U.S. Such warehouses also hold a large portion of all LME and non-LME aluminum stored by warehouses in the U.S. The geographical market for the foregoing product markets is the entire United States.

d. The market for warehousing LME aluminum in the Detroit, Michigan area, or in the alternative, for warehousing all LME and non-LME aluminum in the Detroit area, or warehousing aluminum in Michigan, Ohio, Indiana, Illinois, Wisconsin, Minnesota, contiguous and other areas in which aluminum is purchased and sold based on the Midwest Premium or the Platts MW Premium. The alternative geographical markets are the same as those contained in the alternative definitions of the product market.

26. Pursuant to its agreement with the LME, Goldman has gone into the market in which Plaintiff and other Class members purchased aluminum at the Midwest Premium or Platts MW Premium price, and has inflated prices in that market through Goldman's diversion agreements. After and during such price increases, Goldman has restrained and pulled out of those markets significant supplies of aluminum.

## VII. FACTUAL ALLEGATIONS

### A. The LME's Metro International Detroit Aluminum Warehouses.

27. The LME is the global market for trading aluminum, bringing together industry and financial participants to create a market for buyers and sellers. LME's trading market gives aluminum producers and consumers the ability to hedge against the risk against the rise and fall of aluminum prices. LME held a monopoly on trading aluminum forward or futures contracts in the United States, representing 97-99% of the trading market. Goldman

was the second largest shareholder of LME, holding 1.23 million or 9.5% of its shares.

28.     The LME also certifies warehouses for the aluminum traded on its market. LME certifies these warehouses, and the LME makes agreements with the owners of the warehouses. LME has the right to approve any LME warehouse, the output of aluminum from the LME-approved warehouses, and the storage rates for LME-approved warehouses.

29.     Among other places, LME-certified warehouses are in the Detroit, Michigan area. Metro International owned 27 industrial warehouses (80% of the total LME Warehouses) in the Detroit area. During the time Metro International owned these warehouses, it took about six weeks to extract metal from the warehouses for delivery to customers.

30.     In February 2010, Goldman purchased Metro International for a reported $550 million, acquiring their LME-certified warehouses in Detroit, and the largest aluminum cache in the world. When Goldman purchased Metro International, it owned 29 of the 37 LME-listed warehouses holding 919,000 tons of aluminum in Detroit. With this acquisition, Goldman stores well over 50% of the aluminum in parts of the United States that transact using the Midwest Premium or Platts MW Premium. Goldman also controlled the output of LME-approved aluminum from LME Detroit Warehousing by controlling the rate at which Goldman loads-out aluminum above the agreed-upon minimum load-out rate.

**B.     Goldman's Operation of the Detroit LME Warehouses.**

31.     In 2008, Metro International's stores of aluminum represented about 50,000 tons. By 2010, the stores had grown to 850,000 tons. Goldman steadily increased the aluminum stored in the Detroit LME Warehouses:

| Time | Tons |
|------|------|
| End of February 2009 | 460,000 |
| End of February 2010 | 919,000 |

| End of February 2011  | 1,081,000 |
| End of February 2012  | 1,428,475 |
| End of September 2012 | 1,476,225 |
| End of June 2013      | 1,458,075 |

32.     During the same time, the aluminum stored in LME Warehouses outside of Detroit declined by 50%.

33.     Goldman agreed with the LME it would release a minimum of 1,500 tons of metal per city per day. It also agreed with the LME that the 1,500-ton-release minimum would not be a percentage of warehouse capacity, supply, net out load-ins, or be warehouse-specific.

34.     Goldman then agreed with the LME that the 1,500-ton-release minimum would be a 1,500-ton-release maximum.

35.     To increase the tonnage and length of time of the aluminum stored in its LME Detroit Warehouses, Goldman offered firms $250 or more per ton to store aluminum for longer periods. Goldman also earned around $378,000 a day in rental costs, charging a storage fee of 42¢ per ton per day. The storage fee increased 10% from 2010 to 2012. LME reportedly receives 1.0% of the total storage fees and revenues realized from the LME Detroit Warehouses.

36.     In the first half of 2011, the LME Detroit Warehouses took in over 350,000 tons of aluminum and only delivered 171,350 tons.

37.     By June 2013, it took up to sixteen months for a customer to receive their aluminum from the Detroit LME Warehouses between customer order and delivery. Goldman would also shuttle, or make agreements that would encourage Goldman to shuttle aluminum from warehouse to warehouse in Detroit.

**C.     Customer Complaints.**

38.     In 2011, a senior metals analysis noted, "If you take Detroit in particular, those warehouses historically extracted metal at a faster rate . . . the infrastructure is there."

39.     Novelis, the world's largest producer of rolled aluminum sheet, through its chief procurement officer, noted:

> I don't know the specific details of every warehouse but our view is that they seem to be able to absorb metal coming in at almost an infinite rate so we feel there's a lot more they can do on the output side to push up the (load out) rates . . . [i]t's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market . . . [i]t's because of an issue of accessing metal . . . in Detroit warehouses.

40.     In June 2011, a metals analyst in London at Credit Agricole described the situation as "mak[ing] a mockery of the market" and an "anticompetitive situation."

41.     On June 21, 2011, Jorge Vazquez, a senior vice president at Harbor Intelligence, noted the slow rate of load-outs in the Detroit LME Warehousing was "one of the factors that, without a doubt, is behind record high Midwest premiums."

42.     Coca-Cola Co.'s procurement officer Dave Smith complained "the situation has been organized artificially to drive premiums up . . . it takes two weeks to put aluminum in, and six months to get it out."

43.     In 2011, Coca-Cola Co. lodged a complaint with the LME in response to Goldman's supply bottlenecks.

44.     In June 15, 2012, HKEx announced the purchase of the LME for $2.15 billion ($208 million representing Goldman's stake in LME). HKEx's CEO, Charles Li, stated in October 2012 that the supply bottlenecks were a "level-one issue" and if the "LME system is making clients suffer [through bottlenecks it] is not acceptable." Before Goldman sold the LME to the HKEx, Goldman looked to enrich their holdings rather than to efficiently deliver and market commodities.

45.     On February 1, 2013, Novelis "lost patience with the LME's [failures] to tackle access problems."

46.     On February 26, 2013, analyst Duncan Hobbs said changes in the LME rules "will make no difference to access to dominant metal stocks in [LME Detroit Warehouses]."

**D.      Goldman and the LME's Initial Response to the Complaints.**

47.     Goldman first responded to complaints that it was, in fact, observing its obligations with and the rules of the LME.

48.     In the latter half of 2011, the LME publically discussed increasing the load-out rate to 3,000 tons for LME Detroit Warehousing.

49.     However, Goldman and the LME continued to agree that the minimum-load-out rule should be a maximum load-out rule, there should be no percentage shift in each warehouse, and the load-out rule should be per city and not per warehouse.

50.     On April 1, 2012, the LME and Goldman agreed to change the load-out to 3,000 tons per day per city for the LME Detroit Warehousing.

51.     Goldman increased its storage rates in 2012 and 2013 to justify it as enabling reduction of the delays of load-outs in the LME Detroit Warehouses.

52.     In January 2013, the LME announced that purchasers of aluminum should stop paying high prices and "the solution must come from the market itself."

53.     On April 1, 2013, the LME and Goldman agreed to change the load-out to 3,500 tons per day per city for the LME Detroit Warehousing and increase the storage costs by 6.6%.

54.     On June 7, 2013, Martin Abbott announced his resignation as the CEO of the LME.

55.     On July 1, 2013, the LME (now owned by HKEx) proposed load-out rules

forcing warehouses with 100-day queues to deliver 1,500 tons of metal each day more than is brought in.

56. On July 31, 2013, Goldman finally acknowledged "consumers should not have to wait unusually long times to get the metal they store in warehouses" and that it was contacting customers waiting for aluminum to get them "immediately available aluminum." On this same day, Goldman's President said it felt "horrible for customers if they can't get metal . . . we don't believe that to be the fact."

57. In July 2013, Goldman acknowledged it was suspending incentive payments made to attract metal to their LME Detroit Warehousing.

## E. Government Investigations.

58. In November 2012, the European Union began a review of the LME's warehousing arrangements, following complaints from the aluminum industry.

59. On April 1, 2013, Scott Evans, Goldman's head aluminum trader resigned.

60. On August 13, 2013, the United States Commodities Futures Trading Commission subpoenaed documents from Goldman relating to their LME Detroit Warehousing of aluminum.

61. The United States Department of Justice has reportedly started a preliminary probe into the metals warehousing industry.

62. Ohio Senator Sherrod Brown promised Congressional hearings to determine if banks are manipulating aluminum prices.

## F. Effect on the Midwest Premium.

63. During the Relevant Period, the Midwest Premium has increased to all-time record highs:

| Date | Price |
| --- | --- |

| February 2010 | 6.14 ¢ per pound |
| February 2011 | 6.35 ¢ per pound |
| June 2011 | 8.81 ¢ per pound |
| February 2013 | 11.65 ¢ per pound |
| After February 2013 | 12.00 ¢ per pound |

## G.  The Goldman Defendants' Monopoly Power

64.     Goldman has had monopoly power in the Relevant Markets alleged in Goldman warehouses with 80-plus percent of the LME Detroit Warehousing space. Goldman can control the output of LME-approved aluminum from LME Detroit Warehousing by controlling the rate at which Goldman loads-out aluminum above the agreed-upon minimum load-out rate.

65.     With knowledge from public complaints since 2010 or early 2011 that it was inflating aluminum prices, Goldman has converted the minimum load-out rule into a maximum load-out rule and agreed with the LME to convert the minimum into a maximum. Goldman reportedly further abused such power by shuttling aluminum from one warehouse to another within the Detroit area to use up the minimum quota causing no output of aluminum from the warehouses to the public. Subsidized and incentivized by its monopoly profits from its foregoing abuses, Goldman has made diversion agreements in which it has paid as much as $250 per ton or more to divert more aluminum into the LME Detroit Warehousing. Goldman has abused its monopoly power, the LME has abused its monopoly power, and Goldman and the LME have agreed to abuse their monopoly power in order to anti-competitively and restrictively divert aluminum into and limit unreasonably the free alienability of aluminum stored in, LME Detroit Warehousing. Defendants have inflated aluminum prices including the Midwest Premium or Platts MW Premium price and the storage costs paid directly to the Goldman Defendants, part of which is paid to the LME.

66.     Unless enjoined as alleged, Defendants' ongoing agreement in restraint of

trade and abuse and conversion of their monopoly power will continue, and will spread to other LME Warehouses, further exacerbating the anticompetitive impact on Plaintiff and the Class members.

## VIII. EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFF AND CLASS MEMBERS

67.     Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiff and all Class members.

68.     Defendants' unlawful acts alleged have had a substantial anticompetitive effect on interstate commerce within the United States including by inflating aluminum prices, restraining aluminum, reducing the effective availability of the supplies of aluminum in LME Detroit Warehousing and beyond.

69.     For one example, Defendants' unlawful agreement has caused purchasers of aluminum in the United States whose purchase contracts specify the Midwest Premium or the Platts MW Premium, as a component of the purchase price under the contract, to pay an unlawfully inflated and anomalously increasing premium to purchase aluminum.

70.     Because of Defendants' violations, Plaintiff and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices. The Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition, prices, the quality of storage services, efficiency in storage services, and the level of available output of aluminum. Plaintiff and other members of the Classes were deprived of normal, competitive aluminum prices. Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable and intended result of Defendants' unlawful and manipulative conduct. Consequently, Plaintiff and the Class members suffered financial losses and were, therefore, injured in their business or property.

## IX.   ACTIVE CONCEALMENT

72.     Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff and members of the Class. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants and their co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and overt acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff and members of the Class did not discover, and could not have discovered through exercising reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged until shortly before this class action litigation was commenced.

73.     Because of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all statutes of limitations otherwise applicable to the allegations have been tolled.

## X.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
#### For the Class –
#### Violation of Section 1 of the Sherman Antitrust Act

74.     Plaintiff incorporates and re-alleges, as though fully set forth, every allegation set forth in the preceding paragraphs of this Complaint.

75.     In violation of Section 1 of the Sherman Antitrust Act, Defendants entered into an agreement in unreasonable restraint of trade which intentionally, directly and

foreseeably inflated prices for aluminum in the United States, including, the Midwest Premium or Platts MW Premium premium component of prices.

76.     Defendants' conspiracy constitutes a *per se* violation of the federal antitrust laws.

77.     Defendants made the foregoing agreements to engage in the anticompetitive conduct alleged, inflate aluminum prices, including the Midwest Premium or Platts MW Premium prices of aluminum, and inflate Defendants' profits and revenues. Defendants' agreements did so, and unreasonably restrained trade.

78.     Defendants' agreements constituted unreasonable restraints of trade for many reasons, including :

       a. Diversion Agreements.   To restrain aluminum supplies in LME Detroit Warehousing, Goldman first had to overbid and drive up prices in the markets for physical aluminum based upon the Midwest Premium or Platts MW Premium. As repeated public complaints told Defendants, Defendants' diversion agreements and other steps were inflating the Midwest Premium to all-time-record levels to attract aluminum in LME Detroit Warehousing. That is, Defendants first injured and made targets of purchasers of aluminum at the Midwest Premium or Platts MW Premium price, so as to ship more aluminum into and restrain it in Detroit LME Warehousing.

       b. Inefficiency Agreements.   Defendants established a load-out minimum on a per city rather than a per warehouse basis such that, in industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

       c. Defendants established the minimum load-out based upon an absolute number rather than percentage of capacity of the warehouses, or percentage of the supply in the warehouse basis. In industrial centers, the agreements could be perverted into self-perpetuating feedback loops of greater and greater load-out backlogs and longer storage times.

       d. Defendants established a minimum load-out rule based upon a gross number rather than a net number that subtracted load-ins. The agreement could be perverted into self-perpetuating feedback loops of greater and greater backlogs and longer storage times.

       e. Defendants agreed to transform the minimum load-out requirement, in times of

high storage, into a maximum load-out requirement. In commercial centers the agreements then could be perverted into self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

f.  Defendants agreed to a maximum load-out rate that was 1/6 to 1/20 of an efficient rate of load-outs such that Goldman and the LME could be rewarded for extreme inefficiency with the longer duration of storage revenues from each customer.   They then could leverage such inefficiency into a self-perpetuating feedback loop of greater load-out backlogs and longer storage times.

g.  Defendants agreed to terms that allowed Goldman to subvert even the extremely unreasonably high maximum load-out agreement by shuttling aluminum back and forth from warehouse to warehouse.

h.  Defendants agreed to storage rates much higher than competitive storage rates and agreed that *quid pro quo* increases in storage rates to even higher supra-competitive levels would be made to compensate for any reduction in the extreme unreasonableness of the minimum (in reality, the maximum) load-out rate.

i.  Defendants agreed to leverage their supra-competitive revenues obtained from all the foregoing by Goldman's diversion agreements alleged in (a) above, which further added to the aluminum in storage in LME Detroit Warehousing. In industrial centers, Defendants' agreements then could be further perverted into self-perpetuating feedback loops of greater load-out backlogs, longer storage times, and cause continually higher aluminum prices.

j.  Defendants agreed, as a necessary, intended and direct effect and inextricably intertwined part of their foregoing conduct, to inflate prices for aluminum including the Midwest Premium or Platts MW Premium component of the aluminum price. Defendants inflated such prices to increasingly higher all-time record levels in an economic environment in which such levels made no sense.

79.    As a direct and foreseeable result, Plaintiff and members of the Class were injured in their business and property, by reason of Defendants' violation of Section 1, within the meaning of Section 4 of the Clayton Antitrust Act, including because they paid artificially higher Midwest Premium or Platts MW Premium prices for aluminum than they would have, but for Defendants and their co-conspirators violations of law, which materially and proximately caused such injuries to Plaintiff and the Class.

80.    Plaintiff and the Class members are threatened with impending future injury to

their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act.

81.     The injury and threatened injury to Plaintiff and the Class is of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' acts unlawful.

## SECOND CLAIM FOR RELIEF
### For the Class –
### Violations of Section 2 of the Sherman Antitrust Act

82.     Plaintiff incorporates and re-alleges, as though fully set forth, every allegation set forth in the preceding paragraphs of this Complaint.

83.     In violation of Section 2 of the Sherman Antitrust Act, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein.

84.     Defendants have conspired to, attempted to, and actually abused their monopoly power by the conduct and agreement alleged herein. They have done so in order anti-competitively and restrictively to limit unreasonably the free alienability of aluminum stored in Detroit warehousing and, thereby inflate aluminum prices as well as the storage costs paid directly to Defendants.

85.     Plaintiff and members of the Class were injured in their business and property by reason of Defendants' violation of Section 2 within the meaning of Section 4 of the Clayton Antitrust Act, including because they paid artificially high Midwest Premium or Platts MW Premium prices for aluminum that they would have but for Defendants and their co-conspirators violations of law, which materially and proximately caused such injuries to Plaintiff and the Class.

86.     Plaintiff and the Class members are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 2 of the Sherman Antitrust Act within the meaning of Section 16 of the Clayton Antitrust Act.

87.     The injury and threatened injury to Plaintiff and the Class is of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' acts unlawful.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

1.     That the Court certify this lawsuit as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and designate Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

2.     That the unlawful agreement, conduct, contract, conspiracy or combination alleged by adjudged and decreed to be:

> a.     A restraint of trade or commerce in violation of Sections 1 and 2 of the Sherman Antitrust Act, as alleged in the First and Second Claims for Relief; and

> b.     A restraint of trade or commerce in violation of Section 2 of the Sherman Antitrust Act, as alleged in the Second Claim for Relief.

And that Defendants' continuing and future violations of such laws be enjoined;

3.     That Plaintiff and the members of the Class recover treble damages;

4.     That Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate after service of the initial Complaint in this action;

5.     That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

6.    That Plaintiff and members of the Class obtain such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## XII.   JURY TRIAL DEMAND

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues and claims so triable.

Dated: October 29, 2013

Respectfully Submitted,

WHATLEY KALLAS, LLC
Joe R. Whatley, Jr. (JW1222)
Edith M. Kallas
Ilze C. Theilmann
380 Madison Avenue, 23rd Floor
New York, NY 10017
Tel: (212) 447-7070
Fax: (212) 447-7077
jwhatley@whatleykallas.com
ekallas@whatleykallas.com
ithelmann@whatleykallas.com

EMERSON POYNTER LLP
John G. Emerson
830 Apollo Lane
Houston, TX 77058
Telephone: (281) 488-8854
Facsimile (281) 488-8867
jemerson@emersonpoynter.com

Scott E. Poynter
Christopher D. Jennings
William T. Crowder
Corey D. McGaha
1301 Scott Street
Little Rock, AR 72202
Telephone: (501) 907-2555
Facsimile: (501) 907-2556
scott@emersonpoynter.com
cjennings@emersonpoynter.com
wcrowder@emersonpoynter.com
cmcgaha@emersonpoynter.com